UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DAVID LENT,

                          Plaintiff,

        v.                                                  **DECISION AND ORDER**
                                                            06-CV-569S
SIGNATURE TRUCK SYSTEMS, INC.,
MUNCIE POWER PRODUCTS, INC.,
BASE ENGINEERING, INC.,

                          Defendants.

SIGNATURE TRUCK SYSTEMS, INC.,
MUNCIE POWER PRODUCTS, INC.,
BASE ENGINEERING, INC.,

                          Plaintiffs,
        v.

FERRELLGAS PARTNERS, L.P.

                          Defendant.


## I. INTRODUCTION

In this diversity action, Plaintiff David Lent, seeks recovery in products liability

against three defendants: Signature Truck Systems, Inc. ("Signature"), Muncie Power

Products, Inc. ("Muncie"), and Base Engineering, Inc. ("Base").  Seeking indemnification

and/or contribution, each Defendant has filed a third party claim against Lent's employer,

Ferrellgas, Inc. ("Ferrellgas"),[1] and cross-claims against one another.

Six motions are presently before this Court: Base's and Signature's Motion to Strike

_____

[1]Sued as Ferrellgas Partners, L.P.

1

Lent's Supplemental Expert Report (Docket Nos. 147 and 149) and Summary Judgment Motions by Signature (Docket No. 165), Muncie (Docket No. 161), Ferrellgas (Docket No. 162), and Base (Docket No. 163). As part of their motions for summary judgment, Base and Muncie also seek to exclude Lent's experts. For the following reasons, the motions to strike the supplemental report are denied, the motions to exclude Lent's experts are granted in part and denied in part, and the motions for summary judgment by Signature, Muncie, and Base are granted in part and denied in part. Finally, Ferrellgas' summary judgment motion is denied.

## II. BACKGROUND

### A.    Facts

On December 10, 2003, David Lent was working in his capacity as a propane truck delivery driver for Ferrellgas. Between 1:30 p.m. and 2:00 p.m. on that day, Lent was on a routine delivery in Cassadaga, New York, pumping propane into a customer's tank. (Signature's Statement of Facts ¶ 87; Docket No. 159-40.)[2]   After he had successfully pumped about 17 gallons into the customer's tank, he noticed that the rate of flow from his truck to the customer's tank began to slow. (Lent Affidavit ¶ 22; Docket No. 189-3.) Trying to fix the problem, he began to check a number of things on the truck. (Id. ¶ 23.) When nothing corrected the problem, he tried to check the position of the air actuator lever for the belly valve located under the truck, which he thought might be the source of the problem. (Id. ¶ 23.) Lent states that he kneeled next to the truck's rear wheels, bent down under the

---

[2]This Court has accepted facts included in Defendants' and Plaintiff's Statement of Facts to the extent that they have not controverted each other's statements. See Local Rule 56(a)(2) (statements of material fact that are not specifically controverted by the non-moving party are deemed admitted).

frame rail, and looked under the truck. (Id. ¶ 24.) Suddenly he heard the power take-off (commonly referred to as a "PTO"), designed by Muncie, engage. The PTO, attached to a spinning drive shaft, distributes power to the propane pump. No one can be certain why the PTO activated, but the next thing Lent knew he felt a tug at the back of his jacket. (Id.) Although he has no recollection of the specific events, it appears that his jacket got caught in the PTO drive shaft and he was pulled underneath the truck and into the revolving PTO shaft. (Id.) As a result of this entanglement, in addition to injuries to his left arm, Lent suffered severe injuries to his right arm that ultimately required amputation below the shoulder.

During the course of these events, Lent carried with him a remote control device, designed and manufactured by Base ("Base remote" or "remote"), which could remotely shut off the truck engine, engage the PTO, unwind the hose, or throttle the engine (to increase pump production). (Hahn Report; Docket No. 163-6.) While the engine stop function is mandated by federal regulations, the other options on the remote are optional. See 49 C.F.R. § 173.315.

## B.    Procedural History

Lent initiated this action by filing a complaint in New York State Supreme Court on July 12, 2006 against Defendants Signature, Base, and Muncie. (Docket No. 1-2.) Defendants removed to this Court on August 24, 2006. (Docket No. 1.) Base served its answer and cross-claim against its co-defendants on August 25, 2006. (Docket No. 4.) Signature and Muncie also answered and filed cross-claims against each other and Base. (Docket Nos. 11, 12, 20.) Subsequently, all Defendants filed and served their respective third-party claims against Ferrellgas. (Docket Nos 25,26,29.) Ferrellgas, in turn, filed its

respective answers on February 27, 2007. (Docket Nos. 42-44.)

Base and Muncie move to exclude Lent's experts altogether (Docket Nos. 161, 163.) Base, alternatively, seeks to exclude Hahn's and Dr. Chaplin's supplemental report. (Docket No. 147.) Signature joins the latter action. (Docket No. 149.) All parties, save Lent, move for summary judgment.

## III. DISCUSSION

### A.    Motions to Exclude Hahn's and Dr. Chaplin's Supplemental Reports

On April 26, 2010, Magistrate Judge Hugh Scott entered an amended scheduling order (Docket No. 139) that set a September 15, 2010 deadline for the submission of expert reports. A month later, on October 15, 2010, Lent delivered supplemental reports from his experts James Hahn and Jonathan Chaplin. Due to this delay, Base and Signature have moved to exclude Lent's supplemental expert report as untimely under Fed. R. Civ. P. 37(c)(1).

Hahn's supplemental report explains the feasibility of an "enable" button design on the Base remote[3], while Dr. Chaplin's report describes two differences concerning his proposed "truck mounted isolation power switch,"[4] which is detailed in his initial report. In essence, Base and Signature take issue with the designs outlined in the supplemental

---

[3]According to Hahn, this button can prevent the user from accidentally depressing PTO button. (Hahn Report, July 14, p. 3.) To engage the PTO, the user would first have to press the "enable" button, then in succession, press the PTO button. (Id.)

[4]Dr. Chaplin proposes an "isolation" switch on the back of the truck which would deactivate all the remote's capabilities except "emergency stop." (Chaplin Report, July 15, ¶ 14; Exhibit T.) Because the isolation switch would need to be in the "on" position before the remote could be functional, this would serve a similar purpose in preventing the PTO from accidentally starting.

reports because they differ from the original reports and were submitted after the close of expert discovery.

Fed. R. Civ. P. 37(c)(1) provides that a party who, without justification, fails to disclose information required by Fed. R. Civ. P. 26 shall not be permitted to use that evidence at trial, unless such information is considered harmless. McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 587 (W.D.N.Y.1995). Fed. R. Civ. P. 26(a)(2)(D) requires that expert disclosures be "made at the time and in the sequence that the court orders." Preclusion of a proposed expert's testimony and report, disclosed in violation of a scheduling order is a proper sanction where the tardy expert report is offered in opposition to summary judgment. Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 744-45 (Fed. Cir. 1997) (finding exclusion justified where party fails to provide adequate explanation for failure to timely provide expert disclosure in accordance with scheduling order). However, preclusion is not mandated. Compare Trilogy with Lory v. General Elec. Co., 179 F.R.D. 86, 89 (N.D.N.Y.1998) (observing that although the district court was authorized under Fed. R. Civ. P. 16(f) to preclude plaintiff's expert witness report as a sanction for failing, without good cause, to timely disclose such report, as the untimely disclosure was plaintiff's single instance of noncompliance, such harsh sanction was not warranted).

This Court recognizes that preclusion of expert testimony, particularly in a products liability case, is a "drastic remedy" and should be applied only where the "party's conduct represents flagrant bad faith and callous disregard for the federal rules." McNerney, 164 F.R.D. at 587 (internal citation omitted).

In making this determination, courts consider several factors, including: (1) the

reason for the failure to timely disclose, (2) the importance of the testimony, (3) potential prejudice in allowing the testimony, and (4) the availability of a continuance to cure such prejudice. Arnold v. Krause, Inc., 232 F.R.D. 58, 68 (W.D.N.Y. 2004).

As an initial matter, it is noteworthy that the reports in question are, in fact, supplemental. Unlike the cases on which Defendants rely, Lent did not fail to conduct any discovery whatsoever, as in Arnold; nor did he fail to disclose any experts before the ordered deadline, as in Exxon Corp. v. Halycon Shipping Co., 156 F.R.D. 589 (D.N.J. 1994).

To the extent that courts have found supplemental reports unduly prejudicial and subject to preclusion or sanction, they have done so where the supplemental report contained new theories of liability or included vast amounts of new information. See, e.g., Rambus v. Infineon Techs. AG, 145 F. Supp 2d 721 (E.D. Va. 2001) (precluding an expert's supplemental report that was submitted a week before trial because it contained new topics never previously disclosed); Henderson v. Nat'l R.R. Passenger Corp., 412 Fed. Appx. 74, 83 (10th Cir. 2011) (upholding  district court's judgment to strike supplemental report where the supplemental report added "180 pages of information" to a report which was originally only sixteen pages).

 Although Lent offers a limited explanation as to the reasons for his late submission (noting only that he submitted the supplemental report "out of an abundance of caution to eliminate any misunderstanding" about the alternative designs), after reviewing the original and supplemental reports, this Court is satisfied that the supplemental reports do not unduly prejudice Defendants.

In his initial report, Hahn opined that Base should have added an enable button to

its remote and detailed the type of exhibits he would use to illustrate his testimony.  In the supplemental report, Hahn presents some of the those exhibits in more specificity. Also, to demonstrate its feasability, Hahn attaches a photo which depicts Base's own remote with an enable switch located on the front of the device. Of course, Base should be intimately aware of the functionality of its own product and is not prejudiced by this addition; nor does it need to depose Hahn in an effort to understand how it works. Moreover, Hahn had already been deposed on these matters and he described how the alternative designs would work. (Hahn Deposition, pp. 57-66; Docket No. 181; Exhibit C.)

Dr. Chaplin's supplemental report differs in two ways. First, the "on/off" switch described in his initial report disabled the PTO, hose reel, and throttle functions, while the design in the supplemental report disables only the PTO function. Second, inadvertent depressing of the  PTO button with the "on/off" switch in the "off" position not only prevents the PTO from starting, but, in the supplemental report, it turns off the truck engine, too. These changes are not so substantial as to prejudice Defendants. Like Hahn, Defendants had a full opportunity to depose Dr. Chaplin on the substance of his proposed design. These minor changes, offered well in advance of trial, do not require the added expense and delay of further discovery, and they undoubtedly do not warrant the "drastic remedy" of preclusion.

Therefore, Base's and Signature motions to exclude the supplemental reports are denied.

## B.     Motions to Exclude Lent's Expert Witnesses

Not to be confused with the motion to exclude Lent's expert witnesses' supplemental report, Base, this time accompanied by Muncie, seeks to exclude the entirety of Hahn's,

Dr. Chaplin's, and Lent's third expert witness, Dr. Igor Paul's testimony.

**1.      Legal Standard**

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The proponent of expert testimony has the burden of demonstrating by a preponderance of the evidence that the testimony is competent, relevant, and reliable. See Daubert v. Merrell Dow Pharms. Inc., 509 U.S. 579, 592, n. 10, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).10; Koppell v. New York State Bd. of Elections, 97 F. Supp. 2d 477, 479 (S.D.N.Y .2000); Bourjaily v. United States, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). If the expert is deemed competent (otherwise referred to as "qualified"), the trial court must then determine, pursuant to its "gatekeeping" function, whether the proffered expert testimony is "relevant" and "reliable." See Fed. R. Evid. 702 (Advisory Committee Notes, 2000 amendment) (noting that trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony").[5]

---

[5]The Supreme Court has set out four factors that federal courts can consider in weighing the admissibility of expert testimony: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subject to peer review and publication; (3) a technique's known or potential rate of error, and the existence of and maintenance of standards controlling the technique's operation; (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.  Daubert v. Merrell Dow Pharms. Inc., 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This list of factors is neither required for all experts nor does it serve as an exclusive

Evidence is relevant if the testimony tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable. Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 264 (2d Cir. 2002). If the evidence is relevant, the trial court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered" by the trier of fact. Id. at 265.

Expert testimony may be considered reliable if: (1) the testimony is based on sufficient facts or data; (2) the expert's technique or methodology in reaching the conclusion is considered reliable; and (3) the expert has applied the methodology reliably to the facts of the case. Fed. R. Evid. 702. None of these factors are determinative. Id. (Advisory Committee Notes, 2000 amendments); see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150-51, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rather, district courts have broad discretion in deciding the admissibility of expert testimony. See United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011) (citing Kumho, 526 U.S. at 152).

### 2.    James Hahn, Jr., P.E. and Jonathan Chaplin, Ph.D., C. Eng., P.E.

As discussed above, Hahn will testify that the Base remote would have been safer if it was built with an "enable" function and Dr. Chaplin will testify that an isolation switch on the back of the truck is a feasible alternative design. Dr. Chaplin will also testify that Muncie should have mandated a guarded PTO driveline and that Muncie's warning decals

---

list for determining the admissibility of expert opinion testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141-42, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).

were inadequate.

For both experts, Defendant Base largely relies on one argument – that Hahn and Dr. Chaplin rest their conclusions on an assumption that the PTO button was inadvertently depressed, and as such, their opinions are mere conjecture, not based on scientific evidence, irrelevant, and risk prejudicing the jury. In support of this contention, Base notes that neither Hahn nor Chaplin has performed an inspection of the Base Remote itself and they have not tested the circumstances under which the button could have been depressed. Extending this argument to the alternative designs, Base contends that Hahn and Dr. Chaplin cannot state whether the alternative design would result in greater safety because neither they, nor anyone else, is certain how the PTO was actuated in this case.

What is certain, however, is that the PTO was actuated. Generally, this leaves three possibilities: (1) Lent intentionally activated it; (2) Lent inadvertently activated it; or (3) it was activated by some other, unknown, means. Because the second possibility is reasonable, the jury is entitled to credit it; as such, Lent is entitled to offer expert opinions that the device was negligently designed leading to such a result. See Cappellini v. McCabe Powers Body Co., 713 F.2d 1, 5, n.4 (2d Cir. 1983) (interpreting New York law and holding that circumstantial evidence is sufficient as long as the inference sought to be drawn is reasonable, even though contrary inferences might also reasonably be drawn).

Hahn, relying on his extensive background in electrical engineering, developed an alternative design that ostensibly makes it more difficult to inadvertently press the PTO button. As such, it is relevant and reliable. Chaplin, relying on a similar background, developed and tested an isolation switch that also makes it more difficult to mistakenly press the PTO button. His testimony is also relevant and reliable.

10

However, Hahn and Dr. Chaplin also conclude that inadvertent pressing of the PTO caused Lent's injuries. (See Hahn Report, July 14, p. 3 and Chaplin Report, July 15, p. 30) These opinions are not based on any scientific facts or data. Neither Hahn nor Dr. Chaplin performed any investigation or conducted any tests that could lead to this conclusion. While Hahn did conduct a test that measured the amount of force necessary to depress the buttons on the remote, he never applied those results to the circumstances of this case. Although Dr. Chaplin did investigate the truck and perform tests on an exemplar remote, these tests were not the type that could lead to such a conclusion. In fact, it appears that Hahn's and Dr. Chaplin's conclusion that the button was mistakenly pressed derives solely from the deposition testimony of Lent and other witnesses.

Lent concedes that their testimony on this point is improper, stating, "The plaintiff does not intend to ask Hahn, Chaplin or Paul their opinion about whether the PTO button on the remote transmitter was inadvertently activated." (Plaintiff's Memorandum of Law p. 5; Docket No. 189-43.) Accordingly, to the extent that Hahn or Dr. Chaplin will testify that the PTO button was inadvertently depressed, that testimony is precluded.

Muncie offers alternative reasons to preclude Dr. Chaplin's testimony. First, Muncie argues that Dr. Chaplin is not sufficiently qualified. However, an expert "should not be required to satisfy an overly narrow test of his own qualifications." King v. Brandtjen & Kluge, Inc., No. 94 Civ. 4111, 2001 WL 1804345, *2 (W.D.N.Y. June 20, 2001). Nor does an expert's knowledge about a particular subject need be precisely informed about all the details of the issue raised in order to offer an opinion. Id. (citing Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir. 1989)). Dr. Chaplin has extensive experience and education in the industrial machinery field. He is a professor in the Biosystems

11

Engineering Department at the University of Minnesota; he teaches a course in engineering safety; he has Ph.D. in agricultural engineering and is familiar with the operation of PTOs; he is also familiar with industry standards and he teaches a course on warnings in the engineering field. (Chaplin Affidavit ¶ 1; Docket 190-4.) The fact that he may not have previously dealt with the precise type of machinery involved is not dispositive. See Stagl v. Delta Air Lines, Inc., 117 F.3d 76, 82 (2d Cir.1997). Rather, his experience qualifies as "specialized knowledge" gained through "experience, training, or education." Fed. R. Evid. 702. Accordingly, Dr. Chaplin is sufficiently qualified to offer testimony on the safety of the PTO design and the warnings provided by Muncie.

Muncie also argues that Dr. Chaplin's testimony concerning the adequacy of its warnings and the effectiveness of a PTO guard is unreliable.[6] Regarding the warnings, there is no dispute that they do not comply with the relevant American National Standards Institute ("ANSI") guideline. Basing his opinion on this fact and his related experience in the field, Dr. Chaplin has demonstrated that his opinion is sufficiently reliable.

Dr. Chaplin also bases his opinion that the PTO driveline should have been guarded on his experience and education in the industry. Dr. Chaplin has proposed a simple, inexpensive safety feature that has widespread use in farming tractors that utilize PTOs and that is used by at least one truck in Ferrellgas' fleet. Muncie's argument that Dr. Chaplin's opinion should not be trusted simply because such guards are uncommon on propane delivery trucks is without merit.

---

[6]In addition, Muncie argues, like Base, that Dr. Chaplin's testimony is unreliable and lacks a proper foundation because it is based on the assumption that Lent inadvertently triggered the PTO button. That argument is rejected for the same reasons as recited above.

12

### 3.     Igor Paul, Sc.D., P.E.

Dr. Paul's testimony will concern so-called "human factors," which deal with how humans react to certain designs and warnings. His ultimate opinion is that Lent's behavior and actions were reasonable and that he was a victim of a defective design. (Paul Report, p. 5; Docket No. 190-7.) Muncie argues that Dr. Paul does not have the requisite experience in human factors that would qualify him to testify on such matters and that he should be excluded under Daubert.

This Court agrees. Dr. Paul has an impressive and extensive engineering background – including a doctoral degree from Massachusetts Institute of Technology, where he was a professor of mechanical engineering for nearly 40 years – but his opinions in this case are befitting a psychologist, not an engineer. Dr. Paul finds that "persons sustaining severe trauma . . . completely block out the details" and  he opines about the effects of narcotic medication. (Paul Report, p. 4.) Delving into Lent's state of mind, he concludes that it was reasonable for Lent to forget about the warning decals on the truck. (Id.) Yet, Dr. Paul points to nothing in his education or background that would qualify him to make such conclusions. He indicates that he has published over 80 articles, but none on the topic of human factors. (Paul Biographical Sketch p. 1; Docket No. 190-7.) In his memorandum of law, Lent claims that Dr. Paul has "extensive experience" in human factors, but the only evidence of this experience is that he has "used the results of human factors research to design products" and has used a human factors textbook in his classes. (Plaintiff's Memorandum of Law, p. 39; Docket No. 190-57.) This is unpersuasive.

Further, it is at best unclear on what scientific basis Dr. Paul rests his conclusion. He did not utilize any standards or principles from the field of human factors.  He points to

no analysis, study, or investigation that could demonstrate how he determined that a faulty design led to Lent's injuries. Lacking reliable principles or methods, Dr. Paul's testimony is improper under <u>Daubert</u>. <u>See</u> <u>Colon ex rel. Molina v. BIC USA, Inc.</u>199 F. Supp. 2d 53 (S.D.N.Y. 2001) (quoting <u>Cummins v. Lyle Indus.</u>, 93 F.3d 362 (7th Cir.1996) ("Guesswork, even educated hunches by qualified experts, is not enough. The evidence must be genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). Therefore, Muncie's motion to exclude Dr. Paul's testimony is granted.[7]

## C.   Motions for Summary Judgment[8]

After describing the appropriate standard, this Court will first address issues that relate to the all Defendants. Then, in turn, it will address issues unique to the parties.

### 1.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" only if it "might affect the outcome of the suit under governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> In determining whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." <u>Adickes v. S. H. Kress & Co.</u>, 398

---

[7]This conclusion applies to each Defendant.

[8] In this diversity action, New York law governs all issues presented by the motions for summary judgment. <u>McCarthy v. Olin Corp.</u>, 119 F.3d 148, 153 (2d Cir.1997) (applying New York law to products liability action against out-of-state defendants).

U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted); see also Fed. R. Civ. P. 56(c).

"Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (citations omitted).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.

When the parties cross-move for summary judgment, "the standard is the same as that for individual motions for summary judgment." Natural Res. Def. Council v. Evans, 254 F.Supp.2d 434, 438 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." Id. (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).

## 2.    Design Defect[9]

To establish a prima facie case in strict products liability for design defects under New York law, "the plaintiff must show that the manufacturer . . . marketed a product

---

[9]Lent also asserts a negligent design defect claim.  While New York courts generally consider design defect and negligence claims "functionally synonymous," Denny v. Ford Motor Co., 87 N.Y.2d 248, 258 (1995), the Second Circuit has construed this characterization as "dicta," and therefore continues to view this aspect of products liability law in New York as unsettled. Jarvis v. Ford Motor Co., 283 F.3d 33, 63 (2d Cir. 2002). Nonetheless, because Lent must essentially make out the same prima facie case under both theories, this Court will analyze the claims together.

designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." <u>Voss v. Black & Decker Mfg. Co.</u>, 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983). The plaintiff bears the burden of establishing "that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." <u>Id.</u>

In short, Lent has submitted sufficient evidence to withstand summary judgment. Lent's expert, Dr. Chaplin, opined that an unguarded PTO shaft is unreasonably dangerous because of the likelihood of entanglement. He has cited cases where propane delivery drivers, bystanders, and children have been caught in the revolving PTO shaft and have been severely injured. (Chaplin Report p. 10-11.)

Lent has also raised a triable issue of fact that the PTO and the remote could have been designed safer. Dr. Chaplin concluded that PTO guards are inexpensive and common in the agricultural  industry, and he developed an alternative design for the Base Remote. Hahn also developed an alternative remote with an enable button.

Finally, based on Lent's injuries, his proximity to the PTO shaft at the time of the accident, and the possibility that the remote was inadvertently depressed, Lent has raised sufficient questions of fact that the designs at issue were a substantial factor in his injuries. With only three options that could explain the actuation of the PTO, the jury is entitled, based on circumstantial evidence, to conclude that an accidental depressing of the PTO button started the PTO drive shaft in motion and ultimately caused his injuries. <u>See</u> <u>Cappellini,</u> 713 F.2d at 5, n.4.

In products liability cases, it is the fact-finders domain to weigh the evidence and

16

balance the product's risks against its utilities and costs.[10] See Voss, 59 N.Y.2d at 108 ("It will be for the jury to decide whether a product was not reasonably safe in light of all the evidence presented by both the plaintiff and defendant."); Adams v. Genie Indus., Inc., 14 N.Y.3d 535, 542, 929 N.E.2d 380, 903 N.Y.S.2d 318 (2010) (quoting Voss);10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2729.1, at 577 (3d ed.1998) (noting that, by their very nature, products liability cases are rarely appropriate for summary judgment). Therefore, this issue is for the jury.

### 3.    Express and Implied Warranties

Lent alleges breaches of express and implied warranties against Signature, Muncie, and Base. Regarding the express warranty claim, "[p]roof of a defect in the product is not an element of a cause of action for breach of express warranty. Instead, [Lent] must prove that the product did not perform as the manufacturer promised it would." Sanders v. Quikstak, Inc., 889 F.Supp. 128, 133 n. 7 (S.D.N.Y.1995) (citing 1 Michael Weinberger, New York Products Liability § 16.02 (1982)). To establish a prima facie case for breach of express warranty, Lent is required to present some evidence that Defendants made a

---

[10]The determination of whether a product was defectively designed involves balancing the likelihood of harm against the utility of the product and cost of preventing the harm. Factors that may be considered include:

> (1) the utility of the product to the public as a whole and to the individual user; (2) the nature of the product—that is, the likelihood that it will cause injury; (3) the availability of a safer design; (4) the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (5) the ability of the plaintiff to have avoided injury by careful use of the product; (6) the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and (7) the manufacturer's ability to spread any cost related to improving the safety of the design.

Voss, 59 N.Y.2d at 109

specific statement of fact or promise which induced him to purchase the products. <u>Davis v. New York City Hous. Auth.</u>, 246 A.D.2d 575, 668 N.Y.S.2d 391, 393 (2d Dep't 1998); <u>Schimmenti v. Ply Gem Indus.</u>, 156 A.D.2d 658, 549 N.Y.S.2d 152, 154 (2d Dep't 1989). Here, because Lent did not purchase the products in question, he cannot satisfy this test. Accordingly, Lent has not established a prima facie products liability claim based on breach of express warranty and summary judgment is granted to all Defendant's with respect to these claims.

To sustain a claim for breach of implied warranty, Lent must show that the products were not "fit for the ordinary purposes for which such goods are used." <u>Denny v. Ford Motor Co.</u>, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995). Although slightly different than a strict liability tort claim, the required proof is substantially similar. <u>Id.</u> at 261. ("As a practical matter, the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases.") Thus,  for the same reasons that Lent's design defect claim survives a motion for summary judgment, so does his implied warranty claim.[11]

### 4.     Signature Truck Systems, Inc.

Signature assembles and repairs propane delivery trucks. (Mead Affidavit ¶ 14.)  In 2002, Ferrellgas contacted Signature to build the propane truck, model B901, that is the subject of this litigation. (<u>Id.</u> ¶ 18.) This was a fairly typical order for Ferrellgas, as Signature

---

[11]Base relies on <u>Arnold v. Krause</u>, 232 F.R.D. 58 (W.D.N.Y. 2004) for the proposition that Lent's implied warranty claim should be dismissed because it is subsumed by his strict liability claim. This argument misinterprets <u>Krause</u>. The court in <u>Krause</u> did not dismiss the implied warranty claim simply because it was similar to the product liability claim; instead, having already dismissed the product liability claim, it dismissed the implied warranty claim on the same grounds. The opposite is true here.

has built Ferrellgas approximately 75 trucks. (Id.) As part of this order, Ferrellgas requested an unguarded PTO driveline shaft. (Id. ¶ 21.) Signature purchased the PTO, but not the shaft, from Muncie. (Id.) There is no claim that Signature did not install the PTO per Muncie's instructions or that it did not comply with Ferrellgas' requests.

###     i.    Optional Safety Feature

In seeking summary judgment, Signature argues that it cannot be held liable for Lent's injuries because Ferrellgas was a knowledgeable user who chose not to purchase optional safety devices – a PTO driveline guard or a hydraulic pumping system[12] – that Signature offered.

 A defectively designed product "is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." Voss, 59 N.Y.2d at 107. A manufacturer can be held liable for selling a defectively designed product because the manufacturer "is in the superior position to discover any design defects and alter the design before making the product available to the public." Id.

However, this analysis shifts when a buyer, as here, chooses not to purchase an optional safety feature. In that case, a product that fails to incorporate safety equipment is not defective as a matter of law where the evidence and reasonable inferences show that:

(1) the buyer is thoroughly knowledgeable regarding the

_____

[12]A hydraulic drive system is an alternative means of powering the pump. (Chaplin Report pp. 11-12.).  According to Dr. Chaplin this system is safer than a PTO. (Id.) But it is indisputably more expensive.

> product and its use and is actually aware that the safety
> feature is available; (2) there exist normal circumstances of
> use in which the product is not unreasonably dangerous
> without the optional equipment; and (3) the buyer is in a
> position, given the range of uses of the product, to balance the
> benefits and the risks of not having the safety device in the
> specifically contemplated circumstances of the buyer's use of
> the product. In such a case, the buyer, not the manufacturer,
> is in the superior position to make the risk-utility assessment,
> and a well-considered decision by the buyer to dispense with
> the optional safety equipment will excuse the manufacturer
> from liability.

Scarangella v. Thomas Built Buses, Inc., 93 N.Y.2d 655, 661, 717 N.E.2d 679, 695 N.Y.S.2d 520 (1999).

Lent has conceded the first factor but argues that the second and third factors are not met. The facts of Scarangella illuminate the second factor. There, the plaintiff was an employee of a school bus company and was injured when she was struck by a bus which was being operated in reverse in the bus company's parking yard. She sought to hold the bus manufacturer liable for its failure to include a reverse gear warning beep as standard equipment. Id. at 662. The New York Court of Appeals found that because all the evidence suggested that buses only went in reverse while in the bus parking lot and bus drivers were instructed never to go in reverse outside of the lot, under normal circumstances where those around the bus exercised reasonable care, the buses were not unreasonably dangerous. Id. It held:

> Had the accident occurred out of the bus parking yard, or had
> the plaintiff submitted evidence of some incidents of buses
> backing up outside the yard, at least a triable issue of fact
> might have been created as to whether there was an actual
> separate and distinct normal use of the buses without backup
> alarms which was reasonably safe.

Id. at 663.

20

Like this hypothetical situation posed by the <u>Scarangella</u> court, Lent has provided sufficient evidence that under some normal circumstances an unguarded PTO shaft can be unreasonably dangerous.

First, as discussed above, there are triable issues of fact regarding the inherent dangerousness of an unguarded PTO shaft.

Second, this risk can be present under normal circumstances even when those around the truck exercise reasonable care. Part of the duties of a Ferrellgas driver is to inspect the truck on a regular basis. (Lent Affidavit ¶ 5.) Ferrellgas' training materials instructed the drivers to conduct a pre-trip inspection. Part of this inspection involved getting under the truck, grabbing, and shaking the PTO shaft to check for looseness. (<u>Id.</u> ¶ 6.) Ferrellgas expected Lent to frequently check the PTO, PTO shaft, and pump to ensure that nothing was misaligned or otherwise working improperly. (<u>Id.</u> ¶ 8.) Lent also states that he believes he was supposed to get under the truck with the engine running to check for oil and air leaks before making his daily deliveries. (<u>Id.</u>) Further, when confronted with a problem, Ferrellgas instructed drivers to troubleshoot by getting under the truck with the engine running. (<u>Id.</u> ¶ 7.) Unlike the facts of <u>Scarangella</u>, where the type of injury that the plaintiff sustained would not have happened under normal circumstances and with the exercise of reasonable care, here, according to Lent's evidence, it was perfectly normal for drivers to go under the truck and expose themselves to the PTO and the possibility of inadvertent activation. Moreover, Dr. Chaplin has testified that an unguarded driveline poses risks to bystanders and small children.

Dr. Chaplin also asserts that the danger of an unguarded driveline is increased when the driver is carrying a remote that can activate the PTO. This creates an additional

risk of the driver inadvertently depressing the PTO button while under the truck. Lent had this remote on him at all times when operating the truck in question. (Id. ¶ 3.)

Thus, Defendants have not demonstrated the absence of material issues of fact with respect to whether normal circumstances of use exist in which an unguarded PTO is not unreasonably dangerous. Consequently, Defendants have not satisfied the second Scarangella factor, and their motion for summary judgment is denied. Having reached this conclusion, it is not necessary to discuss the third Scarangella factor.[13]

### ii.    Failure to Warn

To establish a failure to warn claim, a plaintiff must show that a "manufacturer has a duty to warn against dangers resulting from foreseeable uses about which it knew or should have known and that failure to do so was the proximate cause of the harm." Burke v. Spartanics, Ltd., 252 F.3d 131 (2d Cir. 2001.)

Signature first argues that its warnings, which were supplied by Muncie and applied as decals to the truck by Signature, were adequate. However, Dr. Chaplin notes that the warnings did not comply with the ANSI standards and they are subject to interpretation. Although not dispositive, these are triable issues for the jury. See Urena v. Biro Mfg. Co., 114 F.3d 359, 366 (2d Cir. 1997) ("The adequacy of the instruction or warning is generally a question of fact to be determined at trial."). What is more, as discussed below (pp.26-27), Lent received instructions from Ferrellgas that conflicted with the warnings from Signature

---

[13]Scarangella does not apply to Muncie because Muncie did not manufacture the drive-line shaft where the guard could have been placed. It cannot offer an optional safety feature to a product which it does not produce. Whether Muncie can be held liable as a component part manufacturer is discussed infra at p. 23.

and Muncie.[14]

Signature next argues that it is absolved of liability as a matter of law because Lent was a knowledgeable user. Where the injured party is fully aware of the specific hazards of a product, there can be no cause of action for failure to warn. Liriano v. Hobart Corp., 92 N.Y.2d 232, 241, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998). There is no dispute that Lent was fully aware of the dangers a PTO can pose. He grew up on a farm where PTOs were used regularly and had been in the propane delivery business for a number of years. He also admits seeing and reading warnings about the PTO in question. However, Lent had only worked with a remote of the type involved in this accident for about a year, and while he did acknowledge that the PTO had unintentionally been activated once in the past, this cannot conclusively demonstrate that he was *fully* aware of the danger as required by Liriano.

Drawing all reasonable inferences in Lent's favor, this Court finds that Lent may not have been aware of the specific hazard that he alleges occurred in this case: that the remote was subject to inadvertent activation and that to ensure his safety he should avoid going under the truck with the remote. Lent states that if he been warned not to go under the truck with the remote on his person he would have heeded that warning. Therefore, this question – whether Lent was a "knowledgeable user" – should be reserved for the jury. See Billiar v. Minnesota Min. and Mfg. Co., 623 F.2d 240, 244, 246 (1980) (assuming that

---

[14]Muncie argues that because Lent cannot recall whether he saw the decal warning on the truck, he should be precluded from claiming that it was inadequate. However, "[A] plaintiff is allowed to proceed with a defective warning claim on the theory that had a warning been made sufficiently 'prominent or more dramatic,' he would have read and heeded it." Cuntan v. Hitachi KOKI USA, Ltd., No. 06 Civ. 3898, 2009 WL 3334364, * 16 (E.D.N.Y. Oct. 15, 2009) (quoting Johnson v. Johnson Chem. Co., 183 A.D.2d 64, 70, 588 N.Y.S.2d 607 (2d Dep't 1992).

23

the plaintiff employee could fall within the knowledgeable user exception, "New York law would allow the jury to decide whether he was sufficiently aware of the danger to exempt the supplier from its duty to warn").[15]

### 5.   Muncie Power Products, Inc.

Muncie manufactured the PTO that was installed on Lent's truck. There is no dispute that Muncie was not involved with the manufacture or installation of the driveline shaft where the guard would have been placed. However, Lent seeks to hold Muncie liable for not requiring or advising Signature to use a guard.

Muncie posits that "New York Courts have long held that if a machine was assembled without any manufacturing defect, completely according to the plans and specifications of the buyer, the manufacturer will not be strictly liable for any injury caused by the product." (Muncie Memorandum of Law p. 2.) However, this rule is only applicable when the manufacturer is unaware of the intended use of its part. See Leahy v. Mid-West Conveyor Co., 120 A.D.2d 16, 19, 507 N.Y.S.2d 514 (3d Dep't 1986) (applying Muncie's rule only because "neither defendant was aware of [the end user's] plans and specifications for the entire system."); Beneway v. Superwinch, Inc., 216 F.Supp.2d 24 (N.D.N.Y. 2002) (holding that component part manufacturer could not be held liable because the end use of its part was not foreseeable); Automobile Ins. Co. of Hartford, Ct. v. Asko Appliances, Inc., No. 09 Civ. 5017, 2011 WL 4434156, *3 (E.D.N.Y Sept. 21, 2011) (quoting Brumbaugh v. CEJJ, Inc., 152 A.D.2d 69, 70–71, 547 N.Y.S.2d 699, 701 (3d Dep't 1989) (in New York, "the pool of potential [strict products liability] defendants has been

---

[15]Because Muncie supplied warning decals which were then applied to the truck by Signature, this finding also applies to Muncie.

judicially expanded to include distributors, retailers, processors of materials and *makers*

*of component parts*, or essentially to any one responsible for placing the defective product

in the marketplace") (emphasis added)).  Here, Muncie was fully aware of the intended use

of its product. In fact, a PTO, standing alone, serves no purpose. It is designed for use with

a shaft. Muncie, clearly cognizant of this intended use, provides the following warning:

> It shall be the responsibility of the installer of a Muncie Power
> Take-Off  to decide whether to install guards and the PTO
> and/or driveline area because of potential exposure to danger.

(Docket No. 161; Exhibit S.)

Muncie's reliance on Rastelli v. Goodyear, where an alleged defect in a tire rim

caused a Goodyear tire to explode, is also unavailing. 79 N.Y.2d 289, 298, 591 N.E.2d 222

(1992). There, the court concluded that Goodyear had no duty to warn because Goodyear

did not contribute to the defect.  Here, it is possible that Muncie contributed to the alleged

defect. Neither the drive shaft nor the PTO by themselves are defective, but when

combined they create an arguably dangerous product. This is a case "where the

combination of one sound product with another sound product creates a dangerous

condition about which the manufacturer of each product has a duty to warn." Rastelli, 79

N.Y.2d at 298 (citing Ilosky v. Michelin Tire Corp., 172 W.Va. 435, 307 S.E.2d 603 (1983)).

Therefore, Muncie has not established that it is entitled to summary judgment simply

because it manufactured a component part. As discussed above, whether the warning it

provided was adequate is a question for the jury.

**6.    Base Engineering, Inc.**

Base designed the remote used to activate the PTO. Base seeks summary

judgment arguing that its remote was reasonably safe, that its design was not a substantial factor in Lent's injuries, and that it cannot be liable for failure to warn because: (1) Lent was aware of the dangers of a PTO and (2) Lent cannot prove that an inadvertent pressing of the remote caused his injuries.

The thrust of these arguments have been addressed above. Dr. Chaplin opined that the remote was defectively designed because the buttons were raised; according to Dr. Chaplin this can lead to unintentional activation. Dr. Hahn designed an alternative remote with a "enable" button, while Dr. Chaplin designed an alternative that incorporated an isolation switch on the back of the truck. In addition, the jury is entitled to find, based on the circumstantial evidence of this case, that the remote was unintentionally depressed. As such, Lent has made out a prima facie case of design defect precluding summary judgment.

Base provided no warnings for its remote, but relies on the knowledgeable user doctrine. As outlined above, this an issue for the fact-finder, precluding summary judgment.

### 7. Ferrellgas, Inc.

Ferrellgas, a propane supplier, employed Lent as a propane delivery truck driver. Ferrellgas asserts that it provided a safe work environment and properly trained Lent in all capacities of his work; as such, it seeks summary judgment for the third party claims that Signature, Base, and Muncie assert against it.

Although Ferrellgas claims it instructed its drivers, including Lent, on the proper procedure for dealing with slow pumping, Lent asserts that he received conflicting advice when it came to this problem. (Lent Affidavit ¶ 13.) He claims that when he encountered a slow pumping problem he was to check the valves beneath the truck, which is contrary

to Ferrellgas' assertion that driver's were to wait for the problem to correct itself. Further, according to Lent, the truck's engine had to be on during this process, because the belly valve (a possible source of the problem) is air-actuated and only works when the engine is running. (Id. ¶ 9.) This conflicts with other instructions and warnings that Lent received, which instructed him never to go under the truck with the engine on.  With such issues of material fact, the question as to whether Lent was properly trained is for the jury.

There are also genuine issues of fact as to whether Ferrellgas was negligent when it purchased the PTO driveline shaft without a guard. Ferrellgas provided the specifications for the truck involved in the accident and it was aware that driveline guards were available but chose not to purchase them. Although Ferrellgas provides reasons for not purchasing these guards, it is the jury's domain to determine whether those decisions were reasonable in light of the risks associated with unguarded shafts.

Similarly, having established that questions of fact exist regarding the alleged defect of the Base remote, questions of fact exist as to whether Ferrellgas' decision to purchase that remote was negligent. Accordingly, summary judgment for Ferrellgas is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, Signature's and Base's motions to strike Hahn's and Dr. Chaplin's supplemental reports are denied. Additionally, Base's and Muncie's motions to exclude Lent's experts is granted with respect to Dr. Paul and denied with respect to Hahn and Dr. Chaplin. However, Hahn and Dr. Chaplin are precluded from offering their opinion or explanation as to how the PTO button was pressed. Also, Signature's, Base's and

Muncie's motions for summary judgment are granted with respect to Lent's express warranty claim and denied in all other respects. Lastly, Ferrellgas' motion for summary judgment is denied in its entirety.

## V.  ORDERS

IT HEREBY IS ORDERED, Base's and Signature's Motion to Strike Hahn's and Dr. Chaplin's Supplemental Report (Docket Nos. 147, 149) are DENIED.

FURTHER, Signature's Motion for Summary Judgment (Docket No. 165) is GRANTED in part and DENIED in part.

FURTHER, Muncie's Motion for Summary Judgment (Docket No. 161) is GRANTED in part and DENIED in part.

FURTHER, Base's Motion for Summary Judgment (Docket No. 163) is GRANTED in part and DENIED in part.

FURTHER, Ferrellgas' Motion for Summary Judgment (Docket No. 162) is DENIED.

SO ORDERED.


Dated:        September 30, 2011
              Buffalo, New York


                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                          Chief Judge
                                        United States District Court